**AHCI, INC., and Jacadeda, Inc.,**
**Plaintiffs–Appellants,**

v.

**LAMAR ADVERTISING**
**OF TENNESSEE, INC.,**
**Defendant–Appellee.**

Supreme Court of Tennessee.

May 1, 1995.

Dudley W. Taylor, Stephen W. Gibson, McDonnell, Dyer & Taylor, Knoxville, for plaintiffs-appellants.

Lawrence Leibowitz, Timothy C. Houser, Leibowitz & Cohen, Knoxville, for defendant-appellee.

### OPINION

DROWOTA, Justice.

The plaintiffs AHCI, Inc. (AHCI) and Jacadeda, Inc. (Jacadeda) appeal from the Court of Appeals' affirmance of the trial court's judgment in this action for the recovery of rent. The specific issue for our determination can be stated as follows: whether the lower courts erred in holding that the holdover tenant, Lamar Advertising of Tennessee, Inc., (Lamar) was not bound by the specific rent increases demanded by the landlords AHCI and Jacadeda, but rather was obligated to pay only the fair market value for its occupation of the premises.

### FACTS AND PROCEDURAL HISTORY

In the late 1970s and early 1980s Lamar's predecessor in title, Creative Displays, Inc., leased certain properties from Claude Mashburn and Paul Brown for the purpose of erecting and maintaining billboards. The

rental for the Mashburn property was $1,500 per year; and the rental for the Brown property was $700 per year. Both leases contained clauses which stated that "this lease shall automatically be extended from year to year under the same terms and conditions as herein specified when the Lessor accepts payment of the rental as above stated." After the initial terms of both leases had expired, Lamar continued to lease the properties at the stated rates by submitting a rental check to the respective landlords at the beginning of each holdover year—October 1 for the Mashburn property, and March 1 for the Brown property.

In July 1987, Jacadeda, a corporation owned exclusively by Mathis Bush (who is also the president of AHCI), purchased the Brown property. In October 1987, AHCI acquired the Mashburn property. Because Lamar was unaware of the latter transaction, it sent a check to Mashburn in October 1987 for the 1987–1988 rent. Mashburn forwarded the check to AHCI, which refused to accept it; AHCI returned the check to Bill Rush, Lamar's property manager. On November 16, 1987, AHCI invoiced Lamar for the rental property at a rate of $750 per month, or $9,000 per year—an amount six times greater than that called for in the original lease. Rush responded that Lamar would not pay the proposed rent, and he attempted to set up a meeting with AHCI to work out an acceptable solution.

On March 3, 1988, Jacadeda invoiced Lamar for the rental on its property at a rate of $750 per month, or $9,000 per year—an amount over twelve times greater than that called for in the original lease. Rush also responded that this demand was too high, and he attempted to negotiate an acceptable solution with Jacadeda.

The record in this case contains correspondence during the years 1988 and 1989 which reflects at least some attempts by the parties to negotiate mutually acceptable lease arrangements. However, no agreement was ever reached; nor did Lamar ever remit any monies to either AHCI or Jacadeda. Instead, AHCI and Jacadeda simply continued to invoice Lamar for rent due on the respective properties.

On May 1, 1990, AHCI brought an action against Lamar to recover the past due rent on its property. After this suit was filed, the parties again attempted to negotiate an acceptable arrangement; however, again these attempts were unsuccessful. In January 1991, both AHCI and Jacadeda ordered Lamar to remove its billboards from their properties; and Lamar immediately complied with this request. On May 24, 1991, Jacadeda brought an action against Lamar to recover the past due rent on its property. These actions were consolidated by order on February 2, 1992.

The case was tried before the Knox County Chancery Court. At trial, AHCI and Jacadeda argued that Tennessee law provides that if a holdover tenant receives reasonable notice of an increase in rent from the landlord and continues in possession of the premises beyond the holdover period, he is bound by the rent increase no matter what sort of protest he may make. The plaintiffs cited two cases—*Brinkley v. Wolcott*, 57 Tenn. 22 (Tenn.1872) and *Russells Factory Stores, Inc. v. Fielden Furniture Co.*, 33 Tenn.App. 688, 232 S.W.2d 592 (1950)—to support this proposition. The trial court, however, rejected this argument. Instead, it held that an implied lease took effect upon the expiration of the holdover periods—on October 1, 1987, with respect to the AHCI property, and on March 1, 1988, with respect to the Jacadeda property. Therefore, the trial court held, Lamar was not responsible for the rent demanded by the landlords; it was only obligated to pay the fair market value for the time it had occupied the premises past the expiration of the respective holdover periods. The trial court supported its holding by distinguishing *Brinkley* and *Russells*; it also cited the Restatement (Second) of Property § 14.5 (1977), which provides that:

> Except to the extent the parties to a lease validly agree otherwise ... the landlord ... is entitled to recover from a tenant improperly holding over after the termination of his lease for the use and occupation of the leased property during the holdover period at a rate based on the previous rental rate, or on the proven rea-

sonable value independently established if that differs from the previous rental rate. Because the plaintiffs had relied exclusively upon *Brinkley* and *Russells,* and had thus not submitted any evidence to establish the value of the properties, another hearing was scheduled to allow the parties to litigate the issue of the properties' fair market value.

At the hearing to determine the plaintiff's rent, after considering expert testimony and the testimony of Mathis Bush and Bill Rush, the trial court found the fair market value for the AHCI property to be $350 per month, or $4,200 per year; and it found the fair market value of the Jacadeda property to be $150 per month, or $1,800 per year. The trial court awarded rent based on these findings.

AHCI and Jacadeda then appealed to the Court of Appeals; and that Court, also citing the Restatement, affirmed the judgment. We granted the plaintiffs' application for permission to appeal in order to address an issue of holdover tenancy that has not received judicial attention for nearly 50 years.

### ANALYSIS

Our analysis in this case must begin with a detailed examination of *Brinkley* and *Russells, supra,* the two decisions relied upon by AHCI and Jacadeda. In *Brinkley,* the defendants leased a storehouse from the plaintiff; the term of the lease ran from September 1, 1866, to August 31, 1867 and the annual rent was $6,000, payable on a monthly basis. On July 20, 1867, the plaintiff's agent informed the defendants that if they held over after August 31st, they would be required to rent the premises for $5,000, payable monthly in advance. After being informed of the new terms, the defendants stated that the rent was too high, but they did not indicate if they would agree to the new terms or not.[1] The defendants did not vacate the premises, and on September 2nd, the plaintiff's agent demanded the new monthly rent of $416. The defendants again protested that the rent was too high; but they offered to either rent the premises for the year for $4,000 or to pay the $416 per

month until they could locate another property. The agent relayed this information to the plaintiff, who refused to alter the terms of the lease. On October 31st, the defendants vacated the premises, and the plaintiff brought suit to recover the unpaid rent. At trial, the court charged the jury that the acceptance of the $416 in September 1867 by the plaintiff, after the defendants had clearly communicated to the agent the conditions on which they were prepared to pay it, constituted an acceptance by the plaintiff of the defendants' "counteroffer." The defendants prevailed in the action, and the plaintiff appealed.

This Court reversed the judgment, holding that the trial court had erred in instructing the jury. The Court explained its holding as follows:

The defendants were notified, before the expiration of the first year, that if they held over after the expiration of their term, they would be required to take the premises for the year at the rent of $5,000 per annum, payable monthly in advance. If they did not desire to accept these terms, it was their duty to have vacated the premises before the 1st of September. If these terms were not accepted, the plaintiff was upon that day entitled to possession. And the mere fact that with this notice they continued to hold possession after that date, in the absence of a different agreement, is sufficient evidence that they accepted the lease for the next year upon the terms proposed by the plaintiff, and the contract thereby became complete. That, at the time these terms were proposed, they said that the rent was too high, and did not then say they would accept the terms, does not change the result. They were notified by the plaintiff that if they held over, he would treat this as an acceptance of his terms. They did hold over, and it is this fact which constitutes their acceptance of the contract.

57 Tenn. at 25–26.

The only other reported decision invoking the rule as enunciated in *Brinkley* is *Russells*

---

**1.** The facts in *Brinkley* are somewhat disconcerting because the rent demanded by the landlord was in fact lower than the original rent. However-

er, these are the figures that appear in the reporter.

*Factory Stores v. Fielden*, 33 Tenn.App. 688, 232 S.W.2d 592 (1950). In that case, Russells Factory Stores (Russells) rented a floor of a building from Fielden Furniture Company (Fielden) on a month-to-month basis. The rental on the building was $250 per month. On January 12, 1948, Fielden informed Russells that as of February 1, 1948, its rent would be increased to $275 per month. Approximately one week later, Russells notified Fielden that it would vacate the premises before February 1. Russells, however, did not actually vacate the building until February 6. On that day, Russells' president, R.B. Miller, went to Fielden's office for the purpose of returning the key, and while in the office Miller informed C.R. Fielden, the manager of the company, that Russells had moved. Fielden's manager then demanded that Russells remit $275 to cover the rent for the entire month of February. Miller refused, but twice attempted to pay Fielden $60 to cover the six days that Russells had held over. Both of these attempts were refused. Fielden then successfully brought an action to recover the entire's month's rent, and Russells appealed.

The Court of Appeals affirmed the judgment of the lower court. In its analysis, the Court first consulted a treatise and acknowledged a split of authority on the issue:

> In 32 Am.Jur., it says: 'Notwithstanding the circumstance that many of the cases, in dealing with the effect of a landlord's increase in rent, ignore the peculiar character of a tenancy from year to year, or month to month, etc., the legal conclusion seems inescapable that as to such a tenancy, a mere notice of an increase in rent, particularly where, as to time, the notice would not be sufficient for the purposes of a notice to quit, is not binding upon the tenant who merely continues in possession after the current period. However, *some of the cases take the view that a landlord's notice of a change in rent given to his month-to-month or year-to-year tenant renders the tenant liable according to the terms of the notice if he continues in possession beyond the period, whether he actually assents to the change or not, or

> *even though he declares his nonassent thereto.'*

232 S.W.2d at 593 (emphasis in original).

The Court, after citing *Brinkley* to establish Tennessee's adherence to the latter view, concluded that "[t]he defendant having elected to remain in the property for five days in February after receiving the plaintiff's notice that rent would be increased February 1st, defendant became liable for the February rent on plaintiff's terms." 232 S.W.2d at 594.

AHCI and Jacadeda argue that *Brinkley* and *Russells* clearly establish that if the landlord provides reasonable notice to the tenant of a change in terms, the tenant's continued occupation of the premises constitutes an acceptance of those terms, notwithstanding any protest he may make. They argue that the lower courts erred by disregarding well established Tennessee law and instead adopting the position espoused by the Restatement. They conclude that the decision should therefore be reversed and the plaintiffs awarded rent in accordance with the invoiced amounts.

Lamar counters by arguing that *Brinkley* and *Russells* are distinguishable from the present case on two grounds. Lamar's first ground for distinction is that it was not properly notified of the rent increases. Lamar argues that since timely notification is a prerequisite for the invocation of *Brinkley* and *Russells,* the lack of notification relieves it of liability for the rent increases.

Lamar's argument is valid to a certain extent. First, it is true that in order to bind a tenant to a demand for increased rent, the landlord must give the tenant a reasonable notice of the increase. Moreover, it is true that Lamar was not notified by AHCI of the rent increase until November 16, 1987, after the 1987–1988 holdover period had commenced on October 1, 1987; and it was not notified by Jacadeda until March 3, 1988, after the 1988–1989 holdover period had begun to run on March 1. Still, as the plaintiffs point out, this does not mean that the rent would remain the same indefinitely. Rather, the lack of notice for the 1987–1988 period on the AHCI property and the 1988–1989 period on the Jacadeda property would

only, pursuant to the *Brinkley* rule, relieve Lamar of paying the specific rent increases for those periods. However, Lamar clearly had adequate notice that the rent on each parcel would be increased for the lease periods beginning October 1, 1988, and March 3, 1989, respectively. Therefore, Lamar's notification argument does not serve to distinguish *Brinkley* and *Russells* from this case.

Lamar's second ground for distinction is, however, much stronger. Lamar contends that the invoices were not absolute demands that the invoiced amounts be paid, but rather were negotiable offers regarding the rental rate; and that negotiations between the parties continued well after the plaintiffs began issuing the invoices and Lamar had refused to pay the invoiced amounts. Lamar attributes the failure of the plaintiffs to make such a "firm, non-negotiable" demand to the fact that Alcoa Highway, on which both properties are located, had in the early 1980s been designated a scenic highway by the legislature. One of the consequences of the scenic highway designation is that if existing billboards alongside the highway are removed, they cannot be replaced. Therefore, Lamar argues, AHCI and Jacadeda never made an unconditional demand because they wished, above all, to retain Lamar as a tenant and thus maintain the revenue from the billboards. Lamar concludes that because the plaintiffs never made a firm demand for the invoiced amounts, the *Brinkley* rule does not apply to this situation.

■ Although the *Brinkley* and *Russells* decisions do not explicitly address this argument, we agree that a demand by the landlord, as distinguished from an offer, is necessary before the *Brinkley* rule can be invoked, and that the existence of negotiations following the offer renders the status uncertain. If we were to hold otherwise, the landlord could insist that it was negotiating a new rental rate in good faith, make an extravagant demand, and then invoke the *Brinkley* rule to secure that demand if the subsequent negotiations proved fruitless. While *Brinkley* and *Russells* are certainly designed to protect the landlord's freedom to control its property,

those decisions do not serve to convert an offer into a notice that the rent will be increased.

■ As stated above, the record does contain some evidence of negotiations between the parties after the plaintiffs issued the invoices and Lamar refused to pay them.[2] Moreover, the conclusion that substantial negotiations did actually continue is buttressed by the fact that the plaintiffs took no legal action to protect their rights until May 1990—some two and one-half years after Lamar had unequivocally refused to pay the invoiced amount on the Mashburn property. Therefore, because we conclude that the parties continued to negotiate the rental rate until January 1991—when the plaintiffs finally requested that Lamar vacate its properties—the *Brinkley* rule does not apply to this case.

■ Having so held, and given the fact that the leases were not extended beyond the holdover periods, the parties had no lease agreements after November 1987 (with respect to the AHCI property) and March 1988 (with respect to the Jacadeda property). In the absence of such agreements, Lamar may, in accordance with the traditional equitable doctrines of quantum meruit or unjust enrichment, *see Paschall's Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150 (1966), only be held liable for the fair market rental value for the period in which it occupied the premises. *See Revlon Group Inc. v. LJS Realty, Inc.*, 579 So.2d 365 (Fla.App.1991) (although no valid lease agreement existed between assignor and assignee, assignee was required to pay assignor fair rental value for its occupation of premises); *Theriot v. P & R Farms Inc.*, 527 So.2d 3 (La.App.1988) (in the absence of an express lease agreement, owner may recover fair rental value under theory of quantum meruit). Because the lower courts' invocation of the Restatement method comports with these traditional principles, we affirm the judgment of the Court of Appeals.

In summary, the rule as enunciated in *Brinkley* and *Russells* continues to be the law in Tennessee in situations where the

---

2. For example, the record reveals that the parties discussed an arrangement in which the rental rate would be a percentage of Lamar's gross receipts for the billboards.

landlord gives a reasonable notice of the rent increase in the form of a definite demand. Where there is no agreement between the parties, the tenant becomes liable for the fair market rental value for the period that it occupies the premises beyond the term of the lease.

The judgment of the Court of Appeals is affirmed.

ANDERSON, C.J., and REID, BIRCH and WHITE, JJ., concur.