# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT NASHVILLE

JAMES B. OLIVER,           )
                                     )
      Plaintiff/Appellee,    ) Davidson Chancery No. 94-2669-I
                                     )
VS.                          ) Appeal No. 01A01-9705-CH-00197
                                     )
HARRIET C. UPTON,        )
                                     )
      Defendant/Apellant.   )

APPEAL FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE
THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

**FILED**

April 3, 1998

Cecil W. Crowson
Appellate Court Clerk

**RICHARD DANCE**
**DANCE, DANCE & LANE**
Nashville, Tennessee
Attorney for Appellant


**DONALD J. SERKIN**
Nashville, Tennessee
Attorney for Appellee

**AFFIRMED IN PART, REVERSED IN PART
AND REMANDED**

**ALAN E. HIGHERS, J.**

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**HEWITT P. TOMLIN, JR., Sr. J.**

Defendant Harriet C. Upton, now known as Harriet Cathey, appeals the trial court's final judgment awarding Plaintiff/Appellee James B. Oliver the sum of $15,225.66, continuing in effect the lis pendens filed against the subject property pending Cathey's satisfaction of the judgment, denying Cathey's request for attorney's fees, and assessing forty percent (40%) of the costs against Cathey. We affirm the judgment in part (with modifications), reverse in part, and remand for further proceedings.

I. Factual and Procedural History

On August 14, 1993, the parties entered into a lease agreement whereby Cathey leased to Oliver the premises located at 202 Overcrest Court in Davidson County for his use as a residence. At the time the parties executed the lease, they also discussed Oliver's future purchase of the property. Cathey was experiencing marital difficulties at the time (which ultimately resulted in her divorce), and she was interested in selling the property because she feared that she could not afford the mortgage payments.

As executed, the lease provided for a term of one (1) year, commencing September 1, 1993, and ending August 31, 1994. The lease required Oliver to make monthly rental payments to Cathey in the amount of $727. This amount approximated Cathey's monthly mortgage payments on the property. The lease also required Oliver to surrender the premises to Cathey at the termination of the lease, and it contained a provision for attorney's fees in the event that Cathey was required to retain an attorney to enforce her rights under the lease. The lease form was provided by Oliver, who had obtained the form from an attorney.

In contemplation of Oliver's future purchase of the property, the lease also contained the following provisions, which were handwritten on the lease form by Oliver at the time the lease was executed:

> Parties agree that rental payments will be applied towards the
> future purchase of said property. Parties also agree that any

> necessary costs for repairs, improvements, etc. paid by lessee
> shall also be applied towards rent/purchase.

Several months into the term of the lease, Oliver discovered that Cathey had failed to make several mortgage payments and that the property was in danger of foreclosure. With Cathey's knowledge and consent, therefore, Oliver begin sending his rental payments directly to the mortgage company rather than to Cathey. This arrangement continued throughout the remainder of the lease term.

In July 1994, the parties conducted negotiations relative to Oliver's purchase of the property. Negotiations on behalf of Oliver were conducted by Jose Gonzalez, whom Oliver had authorized to act on his behalf. On July 21, 1994, Gonzalez faxed a memorandum to Cathey in which he proposed, on behalf of Oliver, to pay her a total of $3,727.73 at closing. This amount represented Cathey's equity in the property, minus the rental payments Oliver had made to Cathey and to the mortgage company. Cathey made numerous changes to the figures proposed on the memorandum and faxed the document back to Gonzalez. In her fax, Cathey indicated that she wanted a total payment of $12,460.65 at closing instead of $3,727.73. A note written by Cathey on the memorandum explained that she disagreed with the manner in which Oliver's proposal credited the rental payments which he had made to the mortgage company. Specifically, Cathey objected that, under Oliver's proposal, these payments were applied to reduce both the mortgage balance and Cathey's equity in the property. Negotiations subsequently failed due to the parties' disagreement over this issue.

When Cathey's counterproposal was not accepted, she sent another fax to Gonzalez in which she stated that she had decided not to sell the house to Oliver. The fax also reminded Gonzalez that Oliver's lease would expire August 31, 1994, and she requested that Oliver move from the premises by that date.

Instead of vacating the premises, on September 1, 1994, Oliver filed this action for specific performance whereby he sought an order requiring Cathey to sell the subject

3

property to him. As grounds therefor, Oliver alleged that the parties had entered into a sale contract which was evidenced by the parties' August 14, 1993, lease agreement and the July 21, 1994, memorandum exchanged between the parties. Alternatively, Oliver's complaint sought damages for breach of contract and fraudulent misrepresentation.

In her answer, Cathey raised the defenses of the statute of frauds and lack of consideration. Cathey also filed a counterclaim for possession of the property. While the lawsuit was pending, Cathey notified Oliver that she was raising his monthly rental payments from $727 to $1,000, effective September 1, 1995. Oliver continued to reside in the house and continued to make payments directly to the mortgage company throughout this litigation.

After conducting a bench trial, and after entertaining the parties' various post-trial motions, the trial court entered its final judgment which (1) denied Oliver's claim for specific performance; (2) awarded Oliver a judgment in the amount of $15,225.66; (3) ordered that the lis pendens which Oliver had filed against the property remain in effect until Cathey satisfied the judgment; (4) refused to grant Cathey a writ of possession for the property; (5) denied Cathey's claim for attorney's fees; and (6) assessed 40% of the costs against Cathey.

On appeal, Cathey raises the following issues, which we have summarized for purposes of clarity and brevity:

(1) Whether the trial court erred in calculating the amount of the judgment entered in favor of Oliver;

(2) Whether the trial court erred in refusing to order the release of the lis pendens filed by Oliver against the property;

(3) Whether the trial court erred in failing to grant Cathey an order of possession for the subject property;

(4) Whether the trial court erred in denying Cathey's claim for attorney's fees under the parties' lease agreement; and

4

(5)     Whether the trial court erred in taxing Cathey with 40% of the costs in this case.

## II.  Oliver's Claim for Specific Performance

Because of its potential effect on the other issues presented, we first address an issue raised by Oliver in his answer brief, wherein he argued that the trial court erred in failing to order specific performance of the parties' agreement for the sale of the subject property.  We begin our analysis with the premise that specific performance is an equitable remedy which is not available as a matter of right, but is discretionary with the trial court depending on the facts of each case.  Shuptrine v. Quinn, 597 S.W.2d 728, 730 (Tenn. 1979); GRW Enters., Inc. v. Davis, 797 S.W.2d 606, 614 (Tenn. App. 1990).  In cases involving contracts for the sale of realty, specific performance is not available unless the contract is clear, complete, and definite in all its essential terms.  Shuptrine, 597 S.W.2d at 730; Parsons v. Hall, 199 S.W.2d 99, 100 (Tenn. 1947); GRW Enters., 797 S.W.2d at 614.

To be enforceable, contracts for the sale of realty must satisfy the statute of frauds, which requires that the parties' contract be evidenced by a memorandum or some other writing and be signed by the party to be charged therewith.  Brandel v. Moore Mortgage & Inv. Co., 774 S.W.2d 600, 604 (Tenn. App. 1989) (citing T.C.A. § 29-2-101(4) (1980)).  The memorandum "must contain the essential terms of the contract expressed with such certainty that they may be understood from the memorandum itself or some other writing to which it refers or with which it is connected, without resorting to parol evidence."  Brandel, 774 S.W.2d at 604 (quoting Lambert v. Home Fed. Sav. & Loan Ass'n, 481 S.W.2d 770, 773 (Tenn. 1972)).  Thus, to satisfy the statute of frauds, a party may rely on multiple documents evidencing the same transaction, provided that the writings on their face relate to one another.  Brandel, 774 S.W.2d at 604-05.

5

In the present case, Oliver contended that the statute of frauds was satisfied by (1) the August 14, 1993, lease agreement between the parties, which provided that rental payments would "be applied towards the future purchase of said property," (2) and the memorandum exchanged between the parties in July 1994 which outlined the proposed terms of such a purchase. The trial court, however, ruled that these writings did not evidence an enforceable contract for the sale of the property. The court explained:

> The Lease agreement providing for the Option to purchase the property did not contain the sale price for the property, and the parties could not agree on the sale price, as indicated by [Cathey's] offer and [Oliver's] counter offer with respect to the sale price. . . . The sale price was an essential element of the option to purchase the property. The Court finds the option to purchase agreement so vague and indefinite that it is unenforceable.

On appeal, Oliver insists that the lease and memorandum constitute an agreement which is sufficiently definite in its essential terms to be enforceable. Specifically, Oliver contends that the memorandum reveals that the parties intended for the sale price, or consideration paid, to be (1) Oliver's payment of Cathey's equity in the property, plus (2) Oliver's assumption of the existing mortgage on the property.

We agree with the trial court's analysis of Oliver's claim for specific performance and, thus, conclude that this issue lacks merit. Contrary to Oliver's contention, the memorandum and notes exchanged by the parties demonstrate their continued disagreement over basic terms of the sale contract. Most importantly, these writings reveal that the parties could not agree on a sale price due to their fundamental disagreement over how Oliver's past rental payments would be applied toward the purchase of the property. In his July 21, 1994, offer, Oliver applied both the rental payments made directly to Cathey and the rental payments made to the mortgage company against Cathey's equity in the property. As a result of these calculations, Oliver offered Cathey a closing payment of only $3,727.73. In rejecting Oliver's offer, Cathey pointed out that the payments to the mortgage company already had been applied against the mortgage balance. Cathey objected that, if these payments also were applied to reduce her equity in the property, Oliver would be receiving credit for the payments twice. Cathey subsequently made a

6

counteroffer in which she indicated that she would accept a closing payment of $12,460.65. This counteroffer was never accepted.

After reviewing the documents presented in this case, we agree with the trial court's ruling that the parties' agreement was not sufficiently clear, complete, and definite in all its essential terms so as to warrant specific enforcement. See Bird v. Henderson, 1986 WL 8160, at *1 (Tenn. App. July 24, 1986) (concluding that evidence did not preponderate against trial court's finding that no enforceable contract for sale of real estate existed where evidence disclosed series of negotiations between parties which eventually were terminated). Accordingly, we conclude that the trial court did not abuse its discretion in refusing to grant specific performance of the agreement.

### III. Amount of Oliver's Judgment

Although we affirm the trial court's refusal to grant specific performance of the alleged sale contract, we conclude that the trial court erred in calculating the amount of the judgment awarded to Oliver. The trial court properly ruled that, since the sale contract was not enforceable, Oliver was entitled to a judgment for all payments he made in excess of his rental obligation under the lease agreement. In calculating the amount of the judgment, however, the trial court failed to credit Cathey with all of the rental payments for which Oliver was responsible. Specifically, the trial court credited Cathey with the rental payments owed by Oliver during the initial one-year term of the lease, but the court failed to charge Oliver any rent for the period from September 1, 1994, to August 31, 1995, and it charged Oliver an incorrect amount for the period from September 1, 1995, to April 30, 1996.[1]

At trial, the evidence showed that, during the period from September 1993 through April 1996, Oliver made payments totaling $26,885.82, including an $800 payment to the

---

[1]Oliver contends that the amount of the award should be upheld because it includes damages for fraud. The trial court's final judgment, however, makes no finding of fraud or misrepresentation against Cathey.

7

mortgage company after the trial started and a $172.95[2] payment for carpet cleaning. Oliver's rental obligation for this same period of time totaled $25,448.[3] The judgment entered in favor of Oliver, therefore, should have totaled $1,437.82, not $15,225.66, and we modify the judgment accordingly.[4]

## IV. Termination of Lis Pendens

We also agree with Cathey's contention that the trial court erred in ruling that the notice of lis pendens filed against the subject property would not "cancel" until the satisfaction of Oliver's judgment. The rule of lis pendens provides that, "[d]uring the pendency of an action in equity, neither party to the litigation can so alienate or encumber the property in dispute as to affect the rights of his opponent." Henry R. Gibson, Gibson's Suits in Chancery § 89, at 85 (William H. Inman ed., 7th ed. 1988). By filing a notice of lis pendens at the commencement of a lawsuit, a plaintiff provides notice to the world of the existence of a pending action affecting the title or right to possession of the subject property. Figlio v. Shelley Ford, Inc., 1988 WL 63497, at *3 (Tenn. App. June 22, 1988); see also Boyd v. Green Farmers Coop., Inc., 1990 WL 198249, at **2-3 (Tenn. App. Dec. 11, 1990); T.C.A. §§ 20-3-101 to -105 (1994). Prospective purchasers and encumbrancers are thereby put on notice that the plaintiff has a claim which, if successful, would adversely affect their title to the property. Figlio, 1988 WL 63497, at *3; see also Beefy King Int'l, Inc. v. Veigle, 464 F.2d 1102, 1104 (5th Cir. 1972) ("The purpose of a lis pendens is to notify prospective purchasers and encumbrancers that any interest acquired by them in the property in litigation is subject to the decree of the court.").

---

[2]Cathey also challenges this charge, contending that, under the parties' lease agreement, Cathey had no obligation to provide cleaning or other maintenance. This argument ignores the addition to the lease of the handwritten provision which permitted Oliver to apply "any necessary costs for repairs, improvements, etc.," toward his rental payments. Oliver testified that the carpet cleaning was necessary because, when he took possession of the property, the carpets "were extremely dirty with cigarette ashes, dirt, [and] blood."

[3]Under the terms of the parties' lease agreement, effective September 1, 1993, Oliver was required to make rental payments of $727 each month. Inasmuch as Oliver continued to occupy the property after the expiration of the initial lease term on August 31, 1994, Oliver was not relieved of his obligation to make rental payments to Cathey. AHCI, Inc. v. Lamar Advertising of Tennessee, Inc., 898 S.W.2d 191, 194-96 (Tenn. 1995). Effective September 1, 1995, Oliver's monthly rental payments increased to $1,000. The trial took place in April 1996.

[4]We reject, however, Cathey's claim that she is entitled to credit for rental payments covering a period prior to the effective date of the parties' lease.

8

When the suit on which the notice of lis pendens terminates, however, "the right to subject subsequent purchasers and encumbrancers to the claims described in the action on which the lis pendens is based comes to an end." Figlio, 1988 WL 63497, at *4. Accordingly, a lis pendens terminates upon the conclusion of the underlying lawsuit, whether by dismissal or entry of a final decree. Id.; accord Gibson's Suits in Chancery § 89, at 85 (noting that "[t]he lis pendens and the consequent notice begin from the service of process after the filing of the complaint . . . and continue through the entire pendency of the action, and end only when the action is really ended by a final decree."). In fact, under the applicable Tennessee statute, if the court does not order the termination of the notice of lis pendens, the plaintiff has the duty to note the fact of termination in the register's office where the notice is filed. Figlio, 1988 WL 63497, at *4 (citing T.C.A. § 20-2-103).

In accordance with the foregoing authorities, we hold that the trial court erred in ruling that the lis pendens filed in this case would remain in effect until satisfaction of Oliver's judgment. Once the trial court entered its final judgment, the purpose of the lis pendens, to notify potential purchasers or encumbrancers of the pending litigation, no longer existed. Thus, upon the lawsuit's conclusion by the trial court's entry of the final judgment, the lis pendens also terminated.

Our holding does not preclude Oliver from seeking to impose a lien against Cathey's property upon some other legal or equitable basis. The act of filing a notice of lis pendens, however, does not create such a lien. Figlio, 1988 WL 63497, at *3; In re Airport-81 Nursing Care, Inc., 32 B.R. 960, 964 (Bankr. E.D. Tenn. 1983). The filing of a notice of lis pendens is merely a procedural step by which a plaintiff provides constructive notice to third parties of his claim against the subject property. In re Airport-81, 32 B.R. at 964; see also Beefy King Int'l, 464 F.2d at 1104 (A notice of lis pendens "is simply a notice of pending litigation"); Heller v. Turner Bros. Constr., Inc., 663 N.E.2d 1243, 1244 (Mass. App. Ct. 1996) (indicating that practical effect of filing notice of lis pendens is to prevent sale or transfer of property until lawsuit's conclusion, but such notice "is not strictly speaking a lien

on property"). In order to impose a lien against the defendant's property, "[t]here must be some other authority, equitable or otherwise, providing the basis for [such a] right." In re Airport-81, 32 B.R. at 964.

V.  Possession of Property

We further agree with Cathey's contention that the trial court erred in failing to grant her a writ of possession for the subject property.  Section 66-28-512 of the Uniform Residential Landlord and Tenant Act provides that,

> If the tenant remains in possession without the landlord's consent after expiration of the term of the rental agreement or its termination, the landlord may bring an action for possession and if the tenant's holdover is willful and not in good faith, the landlord, in addition, may recover actual damages sustained by the landlord, plus reasonable attorney's fees.

T.C.A. § 66-28-512(c) (1993).

In the present case, Oliver's lease of the subject property expired August 31, 1994. On July 22, 1994, Cathey notified Oliver, through his authorized agent, Jose Gonzalez, that his lease ended on August 31, and she requested him to vacate the premises by that date. Instead of vacating the premises, Oliver brought this action for specific performance on September 1, 1994.  Inasmuch as Oliver remained in possession of the subject property without Cathey's consent after the term of his lease had expired, pursuant to section 66-28-512, we conclude that Cathey was entitled to a writ of possession for the property. See, e.g., Memphis-Shelby County Airport Auth. v. Johnson, 1991 WL 96591, at *3 (Tenn. App. 1991).[5]

---

[5] On appeal, Oliver contends that the trial court properly refused to grant a writ of possession because Cathey failed to comply with the notice provisions of the Uniform Residential Landlord and Tenant Act. Although we have reviewed the record carefully, we are unable to find where Oliver raised this argument as a defense below. Moreover, in raising this defense on appeal, Oliver neither identifies the statutory provisions with which Cathey allegedly failed to comply, nor explains why the notice provided by Cathey failed to comply with these provisions.

10

## VI. Attorney's Fees and Costs

Finally, we conclude that the trial court erred in refusing to make an award of attorney's fees to Cathey. Cathey's claim for attorney's fees was based on the parties' lease agreement, which provided that, "[s]hould this lease be placed in the hands of an attorney, after default or breach for the enforcement of any rights herein reserved or stipulated, the lessee agrees to pay reasonable attorney fees." In denying Cathey's claim for attorney's fees, the trial court noted that Oliver had complied with his obligations under the lease agreement. The lease, however, required Oliver, as the lessee, to surrender the premises to Cathey at the termination of the lease, an obligation with which Oliver failed to comply. When Cathey brought this action for possession, therefore, she was enforcing her rights under the lease. To the extent that Cathey was required to employ an attorney to enforce these rights, she was entitled to an award of attorney's fees. Griswold v. Income Properties, II, 880 S.W.2d 672, 681 (Tenn. App. 1993).

In denying Cathey's claim for attorney's fees, the trial court also noted that the main dispute before the court involved, not the enforcement of the parties' lease agreement, but the interpretation of the option to purchase the property. While we agree with the trial court's assessment of the nature of the dispute before it, we also recognize that at least part of Cathey's attorney's efforts were spent prosecuting the action for possession caused by Oliver's refusal to vacate the premises. Accordingly, we reverse the trial court's order with respect to this issue and remand for the court to make an award of attorney's fees to Cathey based on the amount of the attorney's time which may be attributed to prosecution of the possession action.

We affirm, however, the trial court's decision to tax 40% of the costs against Cathey rather than taxing all of the costs to Oliver. The assessment of costs was within the sound discretion of the trial court, and we conclude that such discretion was properly exercised in this case. Noland Co. v. Crye, 726 S.W.2d 531, 532 (Tenn. App. 1986); T.R.C.P. 54.04.

11

## VII. Conclusion

In conclusion, we modify the trial court's judgment by reducing the amount awarded to Oliver from $15,225.66 to $1,437.82, by granting Cathey a writ of possession for the subject property, and by deleting the provision which continued in effect the lis pendens filed against the property. We reverse that portion of the trial court's judgment which denied Cathey's claim for attorney's fees, and we remand for further proceedings consistent with this opinion. In all other respects, the trial court's judgment is affirmed. Costs on appeal are taxed to Oliver, for which execution may issue if necessary.

_____
HIGHERS, J.

CONCUR:

_____
CRAWFORD, P.J., W.S.

_____
TOMLIN, Sr. J.